## In re METALLIC SPECIALTY MFG. CO.

(District Court, E. D. Pennsylvania. January 23, 1914.)

### No. 4189.

BILLS AND NOTES (§ 438*)—DISCHARGE—CANCELLATION OR SURRENDER OF NOTES.

> To induce a creditor of a corporation who had issued an attachment against it to withdraw its attachment and contribute a specified amount to enable the corporation to meet its pressing demands, it was agreed that certain other creditors would release their demands, among whom was the president's mother-in-law. At his request, the president's wife obtained her notes from the mother-in-law, stating that the company wanted to show them to a creditor in order to show the amount of the indebtedness to her and that she would bring them back to the mother-in-law as soon as she was through with them. The president, however, produced the notes for cancellation at a meeting of the creditors, and, without any inquiry as to his authority to deliver them for cancellation, though they were not indorsed by the mother-in-law, the signatures were torn off and they were treated as canceled. *Held*, that the notes were not in fact discharged, as the president had no authority to surrender them for cancellation, having obtained them for a specific purpose, and there was no reason for applying the doctrine of estoppel, as the notes on their face showed the president's lack of title.

> [Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 1277, 1278; Dec. Dig. § 438.*]

In Bankruptcy. Proceeding against the Metallic Specialty Manufacturing Company. On certificate of the referee concerning the claim of Mary Needles. Order of the referee allowing the claim affirmed.

See, also, 193 Fed. 300.

Allen S. Morgan, of Philadelphia, Pa., for claimant.

C. Wilfred Conard, Frederick W. Bauer, and Simpson & Brown, all of Philadelphia, Pa., for trustee.

J. B. McPHERSON, Circuit Judge. This controversy is over a claim made by Mary Needles against the bankrupt upon two promissory notes. The trustee attacked the claim on the ground that the debt had been released and canceled by Mrs. Needles on or about February 4, 1910. The facts will appear by the report of the referee (Edward F. Hoffman, Esq.):

> "It appeared that Mrs. Needles was the mother-in-law of Marc Sternberg, the president of the corporation. She had been for years a confirmed invalid, suffering from a rheumatic affliction, which confined her to her room and the use of a rolling chair for moving about in her residence. Her depositions were taken by me at her home, 1815 North Broad street, Philadelphia.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

"Prior to the loan in question she had derived a fund of some $17,000 from the sale of real estate, and there is no dispute as to the loan, nor the circumstances under which the notes in question were procured from her, and the occurrences at the meeting I have alluded to.

"The facts are, briefly, as follows: The Metallic Specialty Manufacturing Company was a corporation with a stock issue of $250,000 divided into shares of the par value of $25 each. On or about the time that the loan was made, Mrs. Needles was given, as collateral for a loan of $11,000, 440 shares, or an equivalent to the amount of the loan, taking the stock at par value as collateral security.

"In February, 1910, the Metallic Specialty Manufacturing Company was financially embarrassed. It was being pressed by George S. Rominger for the collection of a claim of $12,948.32 for loans made by him to the corporation. He had placed the collection of his claim in the hands of Messrs. Simpson & Brown, attorneys, and Frederick W. Bauer, Esq., on behalf of this firm, issued a foreign attachment against the corporation.

"As a result of the legal proceedings, a proposition was made to Rominger that for the purpose of avoiding insolvency of the company several of its creditors should release their demands against the company if Rominger would withdraw his attachment and contribute the amount of $2,000 to enable the company to meet its pressing demands, the company to give him its notes for the amount of his original demand with an added amount of $2,000 to be loaned by him. This negotiation with Rominger was conducted on the part of the company by Marc Sternberg, president.

"Of the claims to be released to carry out this negotiation with Rominger it was stipulated in a written agreement that Mrs. Needles should surrender her notes in amount of $11,000 for cancellation. Mrs. Needles, however, was not on terms with her son-in-law, Marc Sternberg. She did not speak to him or have communication of any kind with him, nor was she informed of the transaction that was contemplated with Rominger.

"Marc Sternberg, who was optimistic as to the future of the company if rescued from its impending insolvency, resorted to a fraud to obtain the notes from his mother-in-law. He asked his wife to obtain the notes from her mother without giving to his wife information as to the purpose for which they were to be procured except that they were to be exhibited at a meeting.

"Mrs. Needles' account of the circumstances under which the notes were procured is as follows:

" 'My daughter asked me to let her have the notes to take over to the company, so they could show it to Rominger that I was not any larger creditor than $11,000.

" 'Q. Did she state who directed her to call upon you?'

"(Objected to.)

" 'A. The company.

" 'Q. Was anything said at the time about the return of the notes?

" 'A. She was to bring them back to me just as soon as she was through with them.'

"There is not a word in the testimony that shows that the notes were delivered for any other purpose than that of exhibiting them to show the amount of indebtedness.

"I find as a fact that Mrs. Needles delivered the notes for the sole purpose of allowing the notes to be exhibited to show the amount of the company's indebtedness to her, and if any agency was created by delivery of the notes it was limited to authority only to exhibit them to show amount of indebtedness. The notes having been thus obtained by Mrs. Sternberg were placed in the possession of Marc Sternberg, who in turn took them to the meeting arranged to be held on the 4th of February, 1910.

"He reported to the meeting that he produced Mrs. Needles' notes for cancellation in accordance with the negotiation that had been arranged and without any inquiry as to his authority to deliver the notes other than the possession of them, the signatures were torn off the notes, and they were thereby considered as canceled, and Rominger carried out the agreement he had made

as to the cash contribution and the raising of the foreign attachment against the property.

"A few days after she had delivered these notes, Mrs. Needles made inquiry from her daughter as to the return of the notes. She was first met with evasive answers, and finally, Mrs. Needles having threatened legal proceedings to procure the return of the notes, her daughter told her if she would let her have the stock she would give her new notes. Thereupon Mrs. Needles gave the daughter the 440 shares of stock and new notes were given to her in the amounts of the notes that had been previously trusted to the daughter, but nothing was said to her at any time about the agreement with Rominger or the cancellation of the original notes.

"From the facts I have found I cannot see any terms of agency under which the notes were delivered that could enable Sternberg to affect Mrs. Needles' claim on the notes. If agent at all, he was simply an agent for the custody of the notes. They were obtained from Mrs. Needles by a mere trick devised by Marc Sternberg, and perpetrated through the intervention of the daughter, whom she trusted, and through whom they were obtained without any authority from the party giving the transfer to make any other use of the notes except to exhibit them to show the amount of the company's indebtedness.

"Under these circumstances, I do not see that there is any question of agency in the case.

"When the notes were produced at the meeting, it was incumbent upon the parties interested in the negotiation to show that the debt of which the notes were an evidence were properly released. Mere delivery of the notes without establishing the authority of the holder of the notes to deliver them is not a valid delivery for the purpose of canceling the debt. It is not surprising that when Sternberg produced his mother-in-law's notes at the meeting, offering them for cancellation, that it was taken for granted he did so with the sanction of Mrs. Needles; but this assumption was at the risk of those who acted on it, as the mere possession of a paper that does not pass by delivery does not impart authority to release or collect the debt of which it is the evidence.

"It is settled by innumerable cases that the principal is only bound by the extent of the authority he has conferred upon the agent, and if the agent exceeds the authority conferred the action does not bind his principal. See Ency. of Law, Agency, p. 986.

"In the case of Fletcher v. Integrity Trust Co., 31 Wkly. Notes Cas. (Pa.) 503, it was held that the agent of a depositor in bank to make a deposit in the possession of a deposit book is not authorized to draw on the deposit, though it was deposited in his name as trustee.

"In the case of Investment Co. v. Eldridge [175 Pa. 287, 34 Atl. 629] where the president of a corporation gave false information to a debtor of the corporation as to the value of the stock of the corporation held by the debtor and thus involved the debtor in a loss, in passing upon the effect of these declarations as binding upon the company, Green, J., Supreme Court of Pennsylvania, uses this language: 'It is enough to know that for the wrongful conduct of its president in giving untrue information in the manner proposed to be proved in this case it cannot be that the plaintiff must lose its debt. He had no right to bind the company by any such declarations. He was outside the line of his duty in giving false information, and such action on his part can only be regarded by the law as a transgression of duty and tortious in character.'

"Though the facts in the case quoted are not at all similar to the case in hand, the language is very pertinent.

"The second transaction, the giving of new notes, might have some bearing on the case if Mrs. Needles had been informed of the first transaction; but, having no knowledge whatever of the negotiations with Rominger, the delivery to her of the second notes was simply an attempt at another piece of tortious conduct by Sternberg, which was of no effect. The corporation had just been delivered from immediate insolvency by the contribution of $2,000, and his attempt to conceal his first wrong committed in delivering up the original notes by claiming that the second notes were for the purchase of the stock at par was an absolutely invalid transaction, but Mrs. Needles, not having made a

surrender of her original notes, had a right at any time to surrender the stock and claim on the debt for which the notes were given, and therefore the second transaction, as she was in ignorance all the time of the Rominger negotiations, did not defeat her right to claim on the original indebtedness.

"I therefore admit her claim in amount as filed, $12,086.34."

Little need be added to the foregoing report. As will be observed, the case turns on the facts, and these can hardly be described as in dispute. At all events, I think the evidence does not leave them in doubt, and I concur in the referee's findings.

It is clear that Sternberg had no authority from Mrs. Needles to surrender the notes for cancellation. He had obtained possession of them by a trick, but they had been put into his hands for a specific purpose, namely, to be exhibited to Rominger, and then to be returned to Mrs. Needles. She did not indorse them, and he had no title to them, either real or apparent. They were merely in his custody, and they showed his lack of title on their face. No reason exists therefore to apply the doctrine of estoppel, as in the case where the owner indorses a certificate of stock in blank and delivers it to another person who abuses his trust. I agree that Miller Piano Co. v. Parker, 155 Pa. 208, 26 Atl. 303, 35 Am. St. Rep. 873, is practically identical with the case at bar. As the Supreme Court of Pennsylvania said:

"Mere possession is at best but evidence, prima facie, of ownership of a personal chattel. It is never conclusive of the title. The reason is that it may result from a purchase, a bailment, or a trespass. The general rule is that one cannot make to his vendee a good title to articles that he does not own. If the possession of the seller is that of a bailee or a trespasser, the rule that declares that where one of two innocent persons must suffer loss the loss should fall on him whose act or omission made the loss possible does not apply. A bailment for hire makes it possible for a dishonest bailee to sell the goods to an innocent purchaser, but such a sale will not pass the title of the bailor, for he has done or omitted nothing that should estop him from asserting his ownership of the goods. The contract of bailment made it necessary to give possession of the thing bailed to the bailee for the special and temporary purposes of the bailment, but the title remained in the owner. The fault in such a case is that of the dishonest bailee."

The order of the referee under date of June 17, 1913, allowing the claim of Mary Needles, is affirmed.